ATA DEFENSE INDUSTRIES,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 97–382C.

United States Court of Federal Claims.

June 27, 1997.

---

Claude P. Goddard, Jr., Washington, DC, for plaintiff. Christopher H. Jensen, of counsel.

Kenneth M. Dintzer, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Sharon Y. Eubanks, Deputy Director, Washington, DC, for defendant. Major Daniel Key, Department of the Army, of counsel.

## OPINION

ANDEWELT, Judge.

In this post-award bid protest action, brought pursuant to 28 U.S.C. § 1491(b), plaintiff, ATA Defense Industries, Inc. (ATA), seeks an injunction ordering the Department of the Army to suspend performance of and to terminate a purchase order contract awarded to Caswell International, Inc. (Caswell), on May 13, 1997. Pursuant to the requests of the parties, this case was handled on an expedited basis. Plaintiff filed its complaint on May 30, 1997, and on June 24, 1997, after the parties conducted discovery, this court held a trial on the merits. For the reasons set forth below, plaintiff's request for a permanent injunction is granted.

I.

The purchase order contract in issue covers the upgrading of two target ranges at

Fort Stewart, Georgia, used for training and qualification of tanks and infantry fighting vehicles. The contract lists separately the prices for the different products and services required for the upgrade. The total dollar value of the contract is $673,376. Certain products included on the purchase order, amounting to approximately 65 percent of the total contract value, were covered in an existing General Services Administration (GSA) Federal Supply Schedule (FSS) agreement between Caswell and the GSA. The products and services covering the remaining 35 percent of the contract value were not covered in the FSS agreement.

The contracting officer ultimately limited his search for potential suppliers to those with FSS agreements and concluded that Caswell was the only firm with an FSS agreement that met the Army's minimum requirements for the upgrade. The contracting officer selected Caswell to supply these FSS-covered products as well as the remaining required products and services not covered in the FSS agreement. Prior to awarding the contract, the contracting officer issued a "Justification and Approval for Other than Full and Open Competition" in which he explained his rationale for choosing Caswell as follows:

> Caswell International was the only contractor on the [FSS] which met the minimum requirements of the Government. Since the [FSS-covered] hardware being purchased is unique and proprietary to Caswell International, the associated installation hardware and rail kits [not listed on the FSS] must [also] be acquired from Caswell International.

Plaintiff is a competitor of Caswell in the sale of products and services used in upgrading target ranges for the Army. At the time of the purchase order agreement, plaintiff did not have an FSS contract covering its target-related products. The essence of plaintiff's complaint is that plaintiff was in a position to compete with Caswell for the products and services required to upgrade the target ranges at Fort Stewart but that the Army, in violation of 10 U.S.C. § 2304, denied plaintiff the opportunity to compete.

Indeed, plaintiff had made the Army aware of its intent to compete for the upgrade work. In response to a March 5, 1997, *Commerce Business Daily* notice of the Army's requirement for a target system upgrade at Fort Stewart, ATA submitted a letter to the Army stating that ATA was a "manufacturer of range and target systems" and requesting that it be added to the bidders' mailing list. When the Army later announced in the *Commerce Business Daily* its intent not to purchase the upgrade products and services through a solicitation requesting bids or proposals but rather to order the products and services against the GSA's FSS, ATA submitted a letter arguing that only a fraction of the contract work was covered in the FSS and requesting that instead of using the FSS, the Army adopt "a proper competitive procurement strategy." The Army, however, did not solicit a proposal from ATA. Instead, the Army issued a 15-page, highly detailed statement of work (SOW) setting forth the technical and performance specifications for the Fort Stewart upgrade. Caswell submitted a technical proposal in response to the SOW and the Army issued Caswell the disputed purchase order contract.

## II.

Pursuant to 10 U.S.C. § 2304, when procuring products or services, the head of an agency is obliged to use competitive procedures and obtain full and open competition unless one of the exceptions listed therein applies. Section 2304 provides:

Contracts: competition requirements

(a)(1) Except as provided in subsections (b), (c), and (g) and except in the case of procurement procedures otherwise expressly authorized by statute, the head of an agency in conducting a procurement for property or services—

(A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation; and

(B) shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

Defendant contends that it complied fully with the requirements of Section 2304. To support this contention, defendant in effect divides the purchase order contract into two distinct parts: the products covered in the FSS agreement (approximately 65 percent of the total contract value) and the products and services not covered in the FSS (approximately 35 percent of the contract value). With respect to the products that constitute the 65 percent, defendant takes the position that purchasing these products against the FSS qualifies as a competitive procedure that brings the benefits of full and open competition. With respect to the products and services that make up the remaining 35 percent, defendant does not dispute that the Army purchased these products and services without the benefit of full and open competition. Defendant contends, however, that the procurement of these products and services falls within the following exceptions contained in Sections 2304(c)(1) and (c)(2):

(c) The head of an agency may use procedures other than competitive procedures only when—

(1) the property or services needed by the agency are available from only one responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency; [or]

(2) the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals....

The Administrative Record, as filed by defendant, contains two written justifications issued by the contracting officer respectively covering the exceptions contained in subsections (c)(1) and (c)(2). The contracting officer based the first justification, referenced above and issued prior to award of the disputed contract, on Federal Acquisition Regulation (FAR) 6.302–1, which implements the exception contained in subsection (c)(1). FAR 6.302–1 allows government agencies to purchase products and services on a noncompetitive basis where there is "[o]nly one re-sponsible source and no other supplies or services will satisfy agency requirements." As quoted above, this first justification rests on the conclusion that, as a result of the nature of the products and services involved in the upgrade, because the Army had determined to purchase 65 percent of the items from Caswell under the FSS, the remaining 35 percent of the items were unique and proprietary to Caswell and hence Caswell became the only possible source for these products and services.

The second justification, issued subsequent to the filing of the instant complaint and subsequent to this court's initial hearing on plaintiff's request for a temporary restraining order, covers most of the products and services included in the 35 percent of the purchase order contract that were not covered in the FSS. The contracting officer apparently offered this new justification in part because he had determined that he had erred in his first justification in that contrary to the position taken therein, the products and services not covered in the FSS were available competitively in the marketplace and hence did not qualify for sole source procurement under FAR 6.302–1. The contracting officer based this second justification on FAR 6.302–2 which implements the exception contained in subsection (c)(2) and allows the use of other than competitive procedures where there is an "[u]nusual and compelling urgency."

In the second justification, the contracting officer explained for the first time the apparent basis for his decision not to solicit offers for the contract work from sources that did not have FSS contracts. The contracting officer explained that "[i]n accordance with FAR 8.001, [the] statutory preference is to fulfill agency requirements against the GSA Federal Supply Schedule." With respect to the products and services not covered in Caswell's FSS contract, the contracting officer concluded that a competitive award for these items would result in a minimum delay of 210 days (90 days up through contract award and the remainder for delivery and installation) and that in view of the urgent need for the target range upgrade, such a delay would adversely affect the Army's

"COMBAT READINESS" and in addition would cost the government approximately $6.5 million.

## III.

Before turning to the merits of plaintiff's claim, it is necessary to address a jurisdictional challenge presented by defendant. This court's jurisdiction to entertain objections to a contract after the contract has been awarded is set forth in 28 U.S.C. § 1491(b), which provides:

> (1) [T]he United States Court of Federal Claims ... shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.... [T]he United States Court of Federal Claims ... shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

Defendant contends that plaintiff does not qualify as an "interested party" and hence, plaintiff may not bring suit under Section 1491(b).

### A.

Section 1491(b) does not specifically define the term "interested party." Defendant contends that this court should adopt the definition of "interested party" contained in 31 U.S.C. § 3551(2) and formerly contained in 40 U.S.C. § 759(f)(9)(B).[1] Section 759 provided that upon request of an interested party, the GSA Board of Contract Appeals could, for specified contracts, review any decision by a contracting officer alleged to violate a statute or regulation. Section 3551 grants to the Comptroller General similar review authority with respect to protests filed by an "interested party." The definition of "interested party" in Section 3551(2), which is essentially identical to that in Section 759(f)(9)(B), is as follows:

The term "interested party," with respect to a contract or a solicitation or other request for offers [within the scope of this section], means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.

Defendant argues that under this definition, plaintiff would be barred from filing suit under Section 1491(b) because plaintiff does not qualify as an "actual or prospective bidder."

The definition of "interested party" in Section 3551(2) arguably is more narrow than the definition that would flow from the application of the plain meaning of Section 1491(b). A party reasonably could be deemed to be interested in the award of a contract even if the party is not an actual or prospective bidder. For example, a subcontractor of a bidder on a contract would have an economic interest in the contract award and therefore would be an "interested party" even though the subcontractor is neither an actual nor prospective bidder. It is not necessary, however, for this court to resolve whether Congress intended the term "interested party" to be defined as set forth in other statutes because, although certainly not an "actual" bidder, plaintiff was a "prospective bidder ... whose direct economic interest would be affected by the award of the contract." Hence, plaintiff would qualify as an "interested party" even under the definition set forth in Section 3551(2).

### B.

Defendant bases its argument that plaintiff is not a "prospective bidder" primarily on *MCI Telecomm. Corp. v. United States,* 878 F.2d 362 (Fed.Cir.1989). Defendant argues that *MCI* stands for the proposition that to be a "prospective bidder," a party must expect to submit a bid. Defendant argues that plaintiff could not have expected to bid because the Army had announced its intention to purchase the upgrade products and services against the FSS and plaintiff did not have an FSS contract. In addition, defen-

1. In 1996, Section 5101 of the Clinger–Cohen Act, Pub.L. No.104–106, repealed 40 U.S.C. § 759 and eliminated the GSA Board of Contract Appeals' bid protest jurisdiction.

dant argues that even if plaintiff did qualify as a "prospective bidder" prior to contract award, plaintiff could not have been considered a "prospective bidder" at the time it filed the instant suit because the contract already had been awarded.

■ "Prospective" means "likely" or "expected." *Random House Unabridged Dictionary* 1553 (2d ed.1993). The record herein demonstrates that plaintiff intended and fully expected to present a bid to provide the work covered in the purchase order agreement. Indeed, as described above, plaintiff expressed to the Army its interest in competing for the target upgrade work at Fort Stewart and after the Army announced its intent to use the FSS, requested the Army to adopt "a proper competitive procurement strategy." The essence of plaintiff's contention is that the contracting officer, in violation of statutes and regulations, adopted procedures for the procurement that prevented plaintiff from offering the bid it intended to make, and had the contracting officer complied with proper procedures, plaintiff would have had an opportunity to submit its bid. Hence, in contending that plaintiff could not have expected to present a bid and hence was not a "prospective bidder," defendant relies upon the very procurement procedures that plaintiff alleges violated the law. But if these procedures did violate controlling statutes and regulations, then the procedures cannot properly serve as a rationale for excluding plaintiff from coming within the scope of Section 1491(b).

Section 1491(b) is directed at permitting an "interested party" to secure legal redress when it has a sound objection to "the award of a contract or any alleged violation of statute or regulation in connection with a procurement." Defendant's interpretation of "prospective bidder" would render a party not an "interested party" where, for example, the party expressed its intent to bid on the contract work, was precluded from bidding in violation of controlling statutes and regulations, and would have prevailed in the competitive process had it been allowed to bid. It would seem hard to write a description of a party that is more "interested" in a contract award or more of a "prospective bidder" than a party that possesses these characteristics.

The Court of Appeals for the Fifth Circuit essentially adopted this view in *Rapides Regional Med. Center v. Dept. of Veterans' Affairs*, 974 F.2d 565 (5th Cir.1992), where the court concluded that a party that had not been given the opportunity to present a bid and had filed a protest after the government had entered the disputed agreement was a "prospective bidder" under 31 U.S.C. § 3551(2) because the party, like plaintiff herein, "stood ready and willing to participate ... had it been offered the opportunity to do so." *Id.* at 570. *MCI*, upon which defendant relies and which is discussed below, does not suggest to the contrary. In addition, in *United States v. Compusearch Software Sys.*, 936 F.2d 564, 566 (Fed.Cir. 1991), in the context of a dispute over attorneys' fees, the Federal Circuit concluded that a protestor that had been precluded from bidding on an allegedly erroneous contract modification was an "interested party" under Section 759(f)(9)(B).

■ As explained above, applying Section 3551(2)'s definition of "interested party" to Section 1491(b) would limit potential plaintiffs thereunder to actual and prospective bidders, but there is no indication in the wording of Section 3551(2) that Congress intended to go further and exclude from the scope of "prospective bidders" those parties that intended to present a bid but were prevented from so doing in violation of controlling statutes and regulations. Defendant has not presented a viable rationale based in sound contracting policy for Congress to have intended such a result and allow a contracting officer to make a legally erroneous decision not to entertain an offer from a party seeking to compete for contract work, and then to rely upon that decision as the basis for concluding that the party was not an "interested party."

### C.

Next, defendant argues that even if plaintiff qualified as a "prospective bidder" prior to the award of the disputed contract, upon contract award, plaintiff necessarily lost that status. Defendant argues that a party can

be characterized as a "prospective bidder" only when the party brings suit prior to contract award, *i.e.*, that once the contract is awarded, a party that did not present a bid cannot thereafter be classified as a "prospective bidder." Because the instant suit was filed after the contract was awarded, defendant argues that the status of "prospective bidder" is not available to plaintiff.

The wording of Section 1491(b), however, does not support defendant's interpretation. First, Section 1491(b) provides that with respect to an action brought by an "interested party," "the United States Court of Federal Claims ... shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." If the words "actual or prospective bidder" are used in place of "interested party," as defendant in effect proposes, then the statute literally would grant this court jurisdiction over "such an action[, *i.e.*, an action filed by a 'actual or prospective bidder,'] without regard to whether suit is instituted before or after the contract is awarded." Second, there simply is no requirement in Section 1491(b) that an "interested party" that is improperly precluded from bidding must bring any suit challenging the contracting officer's actions prior to contract award. Applying Section 3551(2)'s definition of "interested party" to Section 1491(b), the statute requires only that the party be a "prospective bidder" and that the party's "direct economic interest would be affected by the award of the contract." As noted above, the *Rapides* court adopted this interpretation when it granted "prospective bidder" status to a party that did not file suit prior to the award of the disputed contract.

In addition to being inconsistent with the words of the proposed statutory definition of "interested party" and the case law analyzing those words, defendant's proposed interpretation also would appear inconsistent with sound contracting policy. It is not apparent why Congress would choose to cut off a prospective bidder's right to bring suit at the time the contract is awarded. Such a rule would have the effect of blocking suits that have the salutary effect of revealing unlawful

procurement practices, of encouraging agencies to keep procurements secret before award, and of spawning additional and unnecessary litigation. As to unnecessary litigation, parties would have a strong incentive to file suit prior to the contracting officer's final determination as to whether to proceed with a disputed award.

*MCI* does not suggest a different interpretation of the statute. Therein, *MCI* had an opportunity to bid on the contract that had been issued but decided instead to participate as a subcontractor on a bid submitted by a competitor. When the bidder with which it had teamed did not receive the award, *MCI* filed suit. *MCI* did not allege that it had been an "actual or prospective bidder" on the contract that had been awarded, but rather that it qualified as a "prospective bidder" because it intended to submit a bid if the court set aside the original award and ordered a new solicitation. The Court of Appeals for the Federal Circuit rejected the contention that a party that had determined not to make a timely bid could qualify as a "prospective bidder," as follows:

> The language of section 759(f)(9)(B) plainly establishes, by use of the word "prospective," that, in order to be eligible to protest, one who has not actually submitted an offer must be *expecting* to submit an offer prior to the closing date of the solicitation. After the date for submission of proposals has passed, however, the would-be protestor can no longer realistically expect to submit a bid on the proposed contract, and, therefore, cannot achieve prospective bidderhood with regard to the original solicitation. This is equally true whether the would-be protestor missed the deadline because it negligently failed to file a proposal, or, as here, because it deliberately chose to be only a subcontractor and not to submit its own proposal.

*MCI*, 878 F.2d at 365.

Contrary to defendant's argument, this paragraph does not suggest that the Federal Circuit interprets "prospective bidder" differently from the court in *Rapides*. Unlike *MCI*, plaintiff herein alleges that it not only expected but also determined to submit a

timely bid but was precluded from doing so by the unlawful procedures adopted by the contracting officer. In the above-quoted paragraph, the *MCI* court indicated no more than if a party had an opportunity to bid on a contract but did not bid within the allowed time frame, then that party cannot be considered an "actual or prospective bidder." The court did not have before it, much less address, the instant situation where the contracting officer precluded a party from submitting a bid allegedly in violation of controlling statutes and regulations. Indeed, in *Compusearch*, 936 F.2d at 566, decided subsequent to *MCI*, the Federal Circuit gave "interested party" status to a plaintiff that did not file suit before contract award.[2]

### IV.

■ Turning to the merits of plaintiff's claim, 28 U.S.C. § 1491(b)(4) provides: "In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of Title 5." Section 706 provides:

The reviewing court shall—

&ast; &ast; &ast; &ast; &ast; &ast;

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. . . .

Such a review ordinarily is limited to consideration of the record before the agency. The reviewing court, however, may consider additional evidence in certain narrowly defined situations, including where the agency action is not adequately explained in the record and where the agency failed to consider factors that are relevant to its final decision. *Cubic Applications, Inc. v. United States*, 37 Fed.

Cl. 339, 342 (1997) (citing *Esch v. Yeutter*, 876 F.2d 976 (D.C.Cir.1989)).

Based on its review of the Administrative Record herein, this court concluded that the record did not fully explain the basis for the contracting officer's application of FAR 6.302–1 and 6.302–2 and that there was a significant question as to whether the contracting officer had considered the relevant factors when he applied these provisions. Hence, the court solicited limited testimony from the contracting officer to explain certain ambiguities in the justifications. Based on the Administrative Record, as supplemented by this limited testimony, the court concludes that the contracting officer's invocation of both FAR 6.302–1 and 6.302–2, although well intended, was not legally justifiable.

### V.

■ The court will address first the justification issued subsequent to the commencement of this action based upon FAR 6.302–2. Prior to the issuance of the purchase order contract with Caswell, certain Army employees had expressed concern that any delay in completing the procurement would have an adverse impact on the Army's training of its troops. The Administrative Record and the contracting officer's testimony, however, demonstrate that the contracting officer made no determination as to whether FAR 6.302–2 could be used and that the contracting officer did not intend to rely upon FAR 6.302–2 as the justification for the sole source portion of the contract. Instead, the contracting officer approved the procurement based exclusively on his determination to purchase a portion of the needed products against the FSS and that FAR 6.302–1 allowed a sole source procurement of the remaining products and services required under the contract.[3] Indeed, had the

2. During trial, defendant also alleged that plaintiff was not a "prospective bidder" because plaintiff lacked the products and technical capacity to satisfy the work requirements of the disputed contract. But Caswell and plaintiff are fierce competitors and each has won significant contracts from the Department of Defense for upgrading target ranges. Over time, as technology has evolved, both competitors have continued to be able to provide competitive products. The products called for in the disputed purchase or-

der contract require relatively minor modifications to plaintiff's existing products and software and plaintiff could have made these modifications in the contract time frame. Plaintiff similarly had the capacity to provide all of the services covered in the contract.

3. In the approval portion of the first justification, the contracting officer stated: "Based on the foregoing justification, I hereby approve the procurement of installation hardware and railbeds

contracting officer concluded that FAR 6.302–2 also applied, he could not have properly issued the first justification under FAR 6.302–1 because FAR 6.302–1(b) provides that "[t]his authority ... shall not be used when any of the other circumstances is applicable."

■ It was not until after plaintiff filed the instant suit and this court first conversed with counsel concerning plaintiff's request for a temporary restraining order that the contracting officer determined to rely upon FAR 6.302–2 to justify the purchase order contract. This is too late. The controlling statutes and regulations require the agency to evaluate its options and to make any determination to use other than full and open competition in procurement prior to entering the contract.

In this regard, 10 U.S.C. § 2304(f)(1) provides:

Except as provided in paragraph (2), the head of an agency may not award a contract using procedures other than competitive procedures unless—

(A) the contracting officer for the contract justifies the use of such procedures in writing and certifies the accuracy and completeness of the justification. . . .

By providing that an agency "*may* not award a contract" (emphasis added) without justifying in writing the use of noncompetitive procedures, Section 2304(f)(1) necessarily contemplates that the determination that an exception applies will precede the award. Section 2304(f)(1) references subsection (f)(2) which concerns procurements under the urgency exception contained in Section 2304(c)(2) and FAR 6.302–2. Subsection (f)(2) allows the contracting officer when issuing a contract based on "unusual and compelling urgency" to delay the justification and approval until after the contract award. But

that delay pertains only to the drafting of the written justification, not the making of the actual determination that the exception applies.[4] Indeed, FAR 6.301(b) requires the agency not only to determine prior to contract award which exception applies, but also to specify in the contract the statutory basis for that exception. FAR 6.301(b) provides: "Each contract awarded without providing for full and open competition shall contain a reference to the specific authority under which it was so awarded. Contracting officers shall use the U.S.Code citation applicable to their agency. (See 6.302.)"

■ This requirement that an agency determine prior to contract award the precise exception upon which it will rely is not happenstance, but rather is part of a comprehensive plan by Congress to improve the efficiency with which federal agencies procure products and services. As explained in detail below, the Competition in Contracting Act of 1984 (CICA), Pub.L. No. 98–369, 98 Stat. 1175 (1984), which amended 10 U.S.C. § 2304, seeks to make government contracting more efficient and rests on a commitment, where practicable, to bring the benefits of competition to government procurement. Application of the CICA anticipates that prior to entering a contract, an agency will make a reasoned determination as to which procedures, competitive or otherwise, would best serve the needs of the agency. If an agency attempts such a reasoned determination and acts consistent with that determination, then the agency is granted extensive deference. An agency's actions are overturned only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). But such deference is not granted where the agency changes its rationale for taking an action after a suit is in-

[not listed on the FSS] associated with the order of M31A1 targetry upgrades against the GSA, [FSS] on an other than full and open competition basis based on the authority of 10 U.S.C. 2304(c)(1). . . ."

4. FAR 6.302–2(c)(1) explains that a justification may be delayed until after contract award only if "preparation and approval [of the written justification] prior to award would unreasonably delay

the acquisition." There is no suggestion in the Administrative Record that preparation and approval of the written justification under subsection (c)(2) "would unreasonably delay the acquisition." Moreover, it would not appear that writing a justification under subsection (c)(2) would have taken materially more time than the justification that was written under subsection (c)(1) prior to award.

stituted attacking the original rationale. *American Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 539, 101 S.Ct. 2478, 2505, 69 L.Ed.2d 185 (1981) ("post hoc rationalizations of the agency ... cannot serve as a sufficient predicate for agency action"); *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) ("The validity of the [agency's] action must ... stand or fall on the propriety of [the contemporaneous explanation]...."); *Parker v. Office of Personnel Management,* 974 F.2d 164, 166 (Fed.Cir.1992). Indeed, if deference were granted in such cases, a significant risk would arise that agency actions would be based on the desire to prevail in litigation rather than to further appropriate agency goals. *See Parker,* 974 F.2d at 166.

The court must stress, however, that to conclude that the contracting officer herein could not legally invoke FAR 6.302–2 retroactively is not to say that the facts that led the contracting officer to issue the second justification are irrelevant to this litigation. In a post-award bid protest action, if the court concludes that the agency's award of the contract was unlawful, the court must next address the appropriateness of granting an injunction. To the extent it were apparent to the court that if the court granted an injunction the agency would simply proceed, within the agency's discretion, to make a new award to the same contractor, then the grant of an injunction would tend to raise form over substance and ordinarily not be warranted. In addition, as described below, one of the factors courts must consider in determining whether to grant an injunction is the harm that would result from such a grant. Hence, to the extent defendant has an urgent and compelling need for target upgrades, the court must consider that need before granting an injunction.

### VI.

Turning to the first justification issued prior to contract award under FAR 6.302–1, to understand the deficiencies therein it is necessary to understand the statutory and regulatory framework in which the contracting officer issued the justification. The CICA was enacted in part because of congressional concern that federal agencies were paying too high a price in their procurement of products and services. Congress was concerned that these agencies too often resorted to sole source procurements and did not take advantage of the lower prices that may result when a procurement is subject to full and open competition. The Court of Appeals for the Federal Circuit explained the purpose of the CICA, as follows:

The [CICA] was "designed to increase the use of competition in Government contracting and to impose more stringent restrictions on the awarding of noncompetitive—sole-source—contracts." H.R. Conf Rep. No. 861, 98th Cong., 2d Sess. 1421, *reprinted in* 1984 U.S.Code Cong. & Ad. News 697, 1445, 2109. The Conference agreement on CICA rejected "effective" competition as too low a standard for government procurements, and instead substituted "full and open" competition as the standard, "to emphasize that all responsible sources are permitted to submit bids or proposals for a proposed procurement." H.R. Conf. Rep. No. 861 at 1422, 1984 U.S.Code Cong. & Ad. News 2110. Indeed, "full and open competition" "means that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement." 10 U.S.C. § 2302(3); 41 U.S.C. § 403(7) (Supp. III 1985).

*SMS Data Prod. Group, Inc. v. United States,* 853 F.2d 1547, 1554 (Fed.Cir.1988).

The CICA embodies a strong commitment to achieving the benefits of competition in government procurement by providing, in 10 U.S.C. § 2304(a)(1), as follows:

Except as provided in subsections (b), (c), and (g) and except in the case of procurement procedures otherwise expressly authorized by statute, the head of an agency in conducting a procurement for property or services—

(A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation; and

(B) shall use the competitive procedure or combination of competitive pro-

cedures that is best suited under the circumstances of the procurement.

The premise that underlies this strong preference for "full and open competition" is the economic premise that has long been recognized as the basis for a free market economic system—that full and open competition brings consumers the widest variety of choices and the lowest possible prices. *See* Adam Smith, *Wealth of Nations* 112 (1776).

Congress' strong commitment to competition is apparent from the narrow breadth of the exceptions to the general mandate to secure full and open competition, such as those contained in 10 U.S.C. § 2304(c)(1) and (c)(2). For example, 10 U.S.C. § 2304(c)(2) authorizes the purchase of products and services without the benefit of full and open competition only in those situations where "the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals." Hence, Congress expresses a willingness to yield the benefits of full and open competition, but only when the alternative is "serious[] injur[y]" to the United States. In addition, even if full and open competition would result in serious injury to the United States, Congress demonstrates its paramount concern for competition by mandating in 10 U.S.C. § 2304(e) that the agency "request offers from as many potential sources as is practicable under the circumstances." Hence, faced with such emergency, an agency still must maintain competition to the extent practicable.

Similarly, 10 U.S.C. § 2304(c)(1) allows a departure from full and open competition only in narrowly defined circumstances. Subsection (c)(1) allows an agency to resort to other than full and open competition for a procurement where:

> (1) the property or services needed by the agency are available from only one responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency....

Where in fact "the property or services needed ... are available from only one responsible source," and the selling party knows that it is the only source, then this exception is hardly a significant departure from full and open competition. In such a case, if the agency used competitive procedures and solicited offers or bids from other sources, that act would be futile because the supplier would be aware, in setting its price, that it was not bidding against any competition.[5] As to the use of sole source procurement where there is more than one but only a limited number of responsible sources, FAR 6.301 still requires that "the contracting officer ... solicit offers from as many potential sources as is practicable under the circumstances."[6]

Next, the CICA recognizes that there are a variety of different procedures that can be classified as "competitive procedures" because they can produce the competitive prices that result from full and open competition. Pursuant to 10 U.S.C. § 2304(a)(2), the head of an agency is authorized to achieve full and open competition through the use of sealed bids or through the solicitation of competitive proposals. Section 2302(2) further provides:

> The term "competitive procedures" means procedures under which the head of an agency enters into a contract pursuant to full and open competition. Such term also includes—

> \*　　\*　　\*　　\*　　\*　　\*

> (C) the procedures established by the Administrator of General Services for the multiple award schedule program of the General Services Administration if—

---

**5.** Full and open competition in such a case could bring benefits to the government when the contracting officer is not absolutely certain that only one responsible source is available in that soliciting bids could produce a bid from an unexpected source.

**6.** The other exceptions listed in 10 U.S.C. § 2304(a)(1) are similarly narrow in scope. Each is designed to address a particular factual situation in which Congress has determined to yield the benefits of full and open competition so as to achieve a particular goal.

(i) participation in the program has been open to all responsible sources; and

(ii) orders and contracts under such program result in the lowest overall cost alternative to meet the needs of the United States....

The FSS, which the contracting officer used herein, qualifies as a "multiple award schedule program of [GSA]." FAR 8.401 explains the purpose and operation of the FSS as follows:

(a) The [FSS], directed and managed by the [GSA], provides Federal agencies with a simplified process for obtaining commonly used supplies and services at prices associated with volume buying. Indefinite delivery contracts (including requirements contracts) are established with commercial firms to provide supplies and services at stated prices for given periods of time. The schedule contracting office issues publications, titled Federal Supply Schedules, containing the information necessary for placing delivery orders with the contractors. Ordering offices issue delivery orders directly to the schedule contractors for the required supplies or services.

Thus, the FSS is directed at the purchase of "commonly used supplies and services" and potentially benefits the federal government, *inter alia,* by allowing GSA to aggregate potential future demands for certain products and services among the various federal agencies and, by using that leverage, to negotiate a price based on volume discounts. The FSS thereby permits individual agencies to purchase a relatively small number of products at prices that ordinarily would be reserved for high volume buyers. The FSS also is beneficial to the government in that it can lower the administrative costs involved in procurement by potentially avoiding the necessity of conducting a new competitive procurement each time a new need for a certain product or service arises.

Although there are different competitive procedures available to federal agencies, it is important to stress that the CICA does not leave these agencies with unlimited discretion to select among them. Rather, Section 2304(c)(1) mandates that the head of an agency "use the competitive procedure or combination that is best suited under the circumstances of the procurement."

## VII.

### A.

With this understanding of the statutory and regulatory background of FAR 6.302–1, the legal inadequacy of the contracting officer's first justification becomes apparent. The total contract value is $673,376 and the first justification covers $228,985 worth of products and services that are covered in the contract but not listed in Caswell's FSS agreement. The contracting officer's rationale in the first justification for not subjecting this $228,985 worth of products and services to full and open competition is that "[s]ince the [FSS-covered] hardware being purchased is unique and proprietary to Caswell International, the associated installation hardware and rail kits [not listed on the FSS] must [also] be acquired from Caswell International." As described above, in the second justification, issued pursuant to FAR 6.302–2 and subsequent to the filing of the instant complaint, the contracting officer acknowledged that this conclusion was erroneous and in fact that $193,060 of the $228,985 of products and services "could ... be solicited in a competitive environment, if urgency did not exist."

██ Defendant contends that even though the contracting officer erred in his first justification, the court nevertheless should uphold that justification because the contracting officer reasonably relied on the advice of a subordinate in reaching his conclusion that a sole source purchase was warranted. But that reliance was not reasonable. The purchase order itself belies the conclusion expressed in the first justification because the purchase order includes products and services, such as computer monitors, laser printers, and the burying of cables, which should be recognized as readily available from sources other than Caswell. In addition, a submission by Caswell that is attached to the disputed contract states that certain of the products covered in the contract and not listed on the FSS "can be purchased on the

open market." Thus, the contracting officer reasonably was on notice that not only were certain of the products and services purchased under the contract on a sole source basis available competitively, but also Caswell apparently intended to purchase these products and services on the open market. The first justification cannot legally support the contracting officer's award of the contract to Caswell. The contracting officer's decision to purchase on a sole source basis $193,060 worth of goods and services that could have been purchased on the open market was an abuse of his discretion and not in accordance with law.[7]

### B.

█ Defendant contends that assuming the grounds stated in the first justification do not support the purchase of the $193,060 worth of products and services that presumably could have been purchased using full and open competition, the court nevertheless should uphold this purchase because these goods and services are "incidental" to the goods that were purchased against Caswell's FSS contract. Defendant cites a series of GAO decisions which defendant contends allow a contracting officer, when purchasing goods from a party with an FSS contract, to include in a single purchase order both those products that are covered in the FSS and those products that are not but are "incidental" thereto. *In re Vion Corp.*, B–275063.2, 97–1 CPD 53; 1997 WL 42513; *In re Raymond Corp.*, B–246410; 1992 WL 52427; *In re Amray, Inc.*, 69 Comp. Gen. 456; 1990 WL 269572; *In re Rack and Stanley*, 61 Comp. Gen. 414; 1982 WL 26627. In *Raymond*, the GAO approved the award of a purchase order contract where the "incidental" items amounted to 17 percent of the total value of the contract. Relying on *Raymond*, defendant argues that because the purchase

of incidental products amounting to 17 percent of the total contract price was allowed in *Raymond*, the contracting officer herein could not be deemed to have abused his discretion in purchasing approximately 35 percent of the value of the contract on a noncompetitive basis because these items also were properly classifiable as "incidental" to the products purchased against the FSS.

The first problem with defendant's argument is that it involves a post hoc rationalization by government counsel and does not represent any decision actually made by the contracting officer. The Administrative Record does not suggest that the contracting officer ever evaluated the proposed contract under the "incidental" theory or ever made a determination that the competitively available products and services were "incidental" to the FSS-covered products. In this regard, assuming *Raymond* was correctly decided and extends to the instant facts, the court cannot presume that the contracting officer, in deciding to award the contract to Caswell, would have chosen to rely upon an "incidentals" theory if he knew his sole source theory was flawed. In this regard, the contracting officer would have had an alternative means to purchase these "incidentals," *i.e.*, to seek competitive bids or offers rather than simply negotiate with Caswell. Hence, the court could not possibly affirm the contracting officer's decision based on a rationale the contracting officer never decided to adopt. *Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).

Second, there is an even more basic problem with defendant relying on the *Raymond* approach to "incidentals." It is fundamentally inconsistent with Congress' unambiguous

---

**7.** Defendant argues that the contracting officer based his decision on the advice of legal counsel and that this advice renders the contracting officer's actions reasonable as a matter of law under *Modern Systems Technology Corp. v. United States*, 24 Cl.Ct. 699, *aff'd*, 980 F.2d 745 (1992). But in *Modern Systems*, the court concluded that it was reasonable for the contracting officer to rely on the advice of counsel concerning the legal effect of a third party contract. In the instant

case, the issue is the legal effect of statutes and regulations that control government procurement. If an agency could insulate a contracting officer's decision on such issues merely by providing incorrect legal advice, then this court effectively would be left without the ability to assure that agencies comply with the mandate of congressional legislation and agency regulations. That certainly is not the law.

statutory mandate in the CICA to allow a contracting officer, when purchasing products against the FSS, to include in the purchase order "incidental" products that are competitively available, unless the prices charged for these "incidental" products are the product of full and open competition. As noted above, Congress unequivocally states in 10 U.S.C. § 2304(a)(1)(A) that in conducting a procurement, unless an exception applies, an agency "shall obtain full and open competition through the use of competitive procedures." As summarized above, these exceptions are specific and narrow in scope. There is no exception that even arguably covers "incidentals."

The authority of an agency to purchase products against the FSS does not extend to incidentals. That authority is based in 10 U.S.C. § 2302(2) which potentially includes, within the definition of the term "competitive procedures," certain procedures established by the Administrator of General Services for the multiple award schedule program. Section 2302(2), however, is in no sense a departure from Congress' strong reliance on competition in government procurements. Rather, Section 2302(2) simply provides contracting officers with an alternative "competitive procedure" by which to achieve the benefits of full and open competition as required in Section 2304(a)(1)(A).

The legislative history of the CICA indicates that the view had been expressed to Congress that GSA's multiple award schedule program should be abolished because it did not result in competitive prices for government agencies. H.R.Rep. No. 861, 98th Cong. (1984), U.S. Code Cong. & Admin. News at 697. Congress, however, decided not to invoke a blanket ban. Instead, Congress classified the procedures established by the Administrator of General Services for the multiple award schedule program as "competitive procedures," and thereby authorized agencies to purchase thereunder without the benefit of competition, but only if:

(i) participation in the program has been open to all responsible sources; and

(ii) orders and contracts under such program result in the lowest overall cost alternative to meet the needs of the United States....

10 U.S.C. § 2302(2)(C). When GSA procedures satisfy these conditions, the argument proceeds, purchases against the FSS bring the benefits of full and open competition and result in competitive prices.[8] But a conclusion that the FSS prices are competitive is necessarily based on price negotiations and evaluations that preceded the inclusion of the specified products and prices in the FSS contract. GSA apparently does not make any effort to negotiate or evaluate prices for products and services that are not listed on the FSS but could be classified as "incidental" to those listed products. This being the case, there is no basis for concluding that the prices negotiated between the contracting officer and the FSS contractor for "incidentals" is the product of full and open competition. In this regard, defendant has not pointed to any procedures adopted by the Administrator of General Services that are directed at assuring that the prices of such "incidental" products would be established by competitive procedures and would be "the lowest overall cost alternative." Hence, unless a product or service falls within an exception contained in Section 2304 or can be classified as de minimis, Section 2304 mandates that the product be purchased on a competitive basis using a competitive procedure as defined in Section 2302. There is no exception covering "incidentals."

On this general point, the court appreciates that federal agencies are constantly seeking more efficient ways to procure goods and services. As described above, the use of schedules from which all government agencies may make purchases is one mechanism that, when properly used, can bring efficiencies to the federal procurement process. The court also recognizes that in certain circumstances, resorting to full and open

---

8. The Administrative Record raises an issue as to whether current GSA procedures are adequate to meet the goal upon which Congress conditioned the status of the multiple award schedule program as a "competitive procedure." In an April 1, 1997, E-mail, an Army employee explained that "[p]ast experience is that competitive cont[r]act costs are usually 20% lower than GSA [schedules]."

competition can actually increase rather than decrease procurement costs. The private model is instructive in this regard as private firms often do not solicit bids or offers from all potential sellers before making a purchase.

But Congress establishes the rules for federal procurement and federal agencies have only the discretion that Congress allows them. In the CICA, Congress expressed concern that federal agencies had misused the authority Congress had granted them and too often resorted to sole source contracts. To control this practice, Congress mandated that unless a statutory exception applies, federal agencies must purchase products and services based upon "full and open competition through the use of competitive procedures." Indeed, in enacting 10 U.S.C. § 2304, Congress rejected the alternative that agencies be required to open competition to just enough competitors to provide "effective competition." H.R.Rep. No. 861 at 1422 (1984), U.S. Code Cong. & Admin. News at 1067. If federal agencies believe that Congress went too far and that Section 2304 results in higher rather than lower procurement costs, then these agencies should take their case to Congress and convince Congress to change the law. Neither the agencies nor the courts can unilaterally create exceptions to the clear mandate that Congress has established.

### C.

■ Next, defendant argues that the FSS-covered portion of the disputed contract was clearly within the contracting officer's discretion and hence, that any injunction should address only the approximate 35 percent of the contract that was not covered in the FSS. Defendant bases this argument in part on FAR 8.001, which provides:

(a) Except as required by 8.002, or as otherwise provided by law, agencies shall satisfy requirements for supplies and services from or through the sources and publications listed below in descending order of priority—

(1) *Supplies.*

\*       \*       \*       \*       \*       \*

(vii) Optional use Federal Supply Schedules (see subpart 8.4); and

(viii) Commercial sources (including educational and nonprofit institutions).

Defendant contends that because purchasing against the FSS is a higher priority than purchasing from a commercial source, the contracting officer's decision to fill the agency's needs first from the FSS is necessarily correct and not subject to review. This contention is incorrect.

FAR 8.001 applies "[e]xcept ... as otherwise provided by law." To the extent FAR 8.001 is interpreted to oblige the Army to purchase all products and services necessary for the target range upgrade against the FSS and then to proceed to competitive sources for the remaining needed products and services not covered in the FSS, the regulation would conflict with Section 2304(a)(1)(B), which mandates that the head of the agency "use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement."

The Army has a variety of different "competitive procedures" potentially available to it for the procurement of the target range upgrade at Fort Stewart. One possible alternative is to purchase certain products from Caswell against its FSS agreement, and either purchase the remaining products on a competitive basis or manufacture them internally.[9] Another alternative is not to split the

9. When an agency's needs involve a system and that entire system can be purchased on a competitive basis in the open market, a potentially compelling argument can be made that it would violate Section 2304 if, as set forth in the first justification, the agency chose not to purchase the entire system on the open market and instead to purchase certain products against the FSS and that purchase in turn resulted in the agency having to purchase the remaining products or services necessary to complete the system from

that FSS contractor on a sole source, and hence noncompetitive, basis. In such a case, the contracting officer would be choosing a method of procurement that would result in a portion of the system being purchased on a noncompetitive basis when the entire system could have been purchased on the open market for a competitive price. The only possible justification for such a result is the authorization in Section 2304(c)(1) for noncompetitive procurement when such a

procurement into two parts but instead to solicit bids or offers to purchase the entire system from a single contractor. As defendant acknowledged in its pretrial brief, this single contractor option is often more efficient. Indeed, if an agency were obliged initially to comb the FSS and purchase all products included on any FSS, and then seek competition for the remaining required products, the total cost of the procurement often could be expected to rise significantly. Because Section 2304(a)(1)(B) obliges the contracting officer to choose the "competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement," if resort to the FSS is not best suited, it would be inconsistent with the contracting officer's obligations under Section 2304(a)(1)(B) to choose that route.

## VIII.

### A.

■ Next, having concluded that the purchase order contract was legally flawed, the court must determine whether to grant plaintiff injunctive relief. An injunction is an equitable remedy that is not granted as a matter of course. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311, 102 S.Ct. 1798, 1802–03, 72 L.Ed.2d 91 (1982). To warrant an injunction, plaintiff must demonstrate that there is an inadequate legal remedy and that if the injunction is not issued, plaintiff will suffer an irreparable injury. *Id.* at 312, 102

S.Ct. at 1803. In addition, the court must consider the harm that would result from granting or withholding the injunction to the parties, third parties, and the public generally. *Id.*[10] Defendant does not dispute that plaintiff has no adequate remedy at law and will suffer an irreparable injury if an injunction is not granted. Defendant, however, contends that an injunction should not issue because of the potential that defendant and the public will suffer substantial harm.

### B.

Looking first at the harm suffered by plaintiff, plaintiff certainly could not be assured that it would prevail in any new procurement if the court granted an injunction forcing termination of the existing purchase order agreement.[11] The opportunity to compete for a contract and secure any resulting profits, however, has itself been recognized to constitute significant harm. *See, e.g., Magnavox Electronic Systems Co. v. United States*, 26 Cl.Ct. 1373 (1992). In addition to potential lost profits with respect to the contract in dispute, the firm that performs the target upgrade work covered in the contract also could have some advantage in follow up contracts for future upgrade work at Fort Stewart. In the absence of an injunction, plaintiff would lose the opportunity to compete for that advantage.

Turning to potential harm suffered by defendant, defendant contends that an injunc-

sole source need arises. But in this factual setting, there arguably is no sole source need until the contracting officer makes a decision to use the FSS, *i.e.*, the contracting officer creates the need for a sole source procurement that otherwise did not exist. Moreover, Section 2304(c)(1) allows other than competitive procedures only when "the property or services needed by the agency are available from only one responsible source." But the property or services needed by the agency is arguably the entire system. Hence, Section 2304(c)(1) may not authorize such an acquisition where use of the FSS results in a sole source purchase. In this regard, to the extent Section 2304(c)(1) constitutes an exception to the general rule favoring full and open competition, its scope arguably should be interpreted narrowly. While this court need not finally resolve this theoretical issue in this opinion, the Army may want to consider this issue in any reprocurement.

10. These factors are the same as those considered for a preliminary injunction. *See, e.g., Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed.Cir.1988). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987).

11. ATA and Caswell are two of the major competitors in the targetry business. Recently, when the government has solicited bids and offers in the open market, ATA has tended to prevail, whereas when the government uses the FSS, Caswell has tended to prevail.

tion may bring significant harm to the United States in that an injunction could negatively affect the training and hence combat readiness of the Army's troops. The potential for such harm obviously is an important consideration in the court's determination whether to grant an injunction. This would be true even without the direction in this court's jurisdictional statute to "give due regard to the interests of national defense and national security." 28 U.S.C. § 1491(a)(3). But while the court certainly must give serious consideration to national defense concerns and arguably should err on the side of caution when such vital interests are at stake, allegations involving national security must be evaluated with the same analytical rigor as other allegations of potential harm to parties or to the public. *See Magnavox*, 26 Cl.Ct. at 1384.

### C.

The target ranges at Fort Stewart are used to train and qualify troops using tanks and Bradley fighting vehicles. Army regulations generally require that every six months troops qualify to meet specified Army requirements. Fort Stewart has a series of different target ranges. Some are used for tanks, some for Bradley fighting vehicles, and some for both. During a training exercise, the troops move from one range to another, with the ranges increasing in difficulty. A typical schedule at Fort Stewart involves tank units training for one and one-half days on a particular range, breaking for two days, training for another one and one-half days on a more difficult range, breaking for an additional two days, and finally training for one and one-half days on a range known as MPRC. The MPRC range is fully modernized and can be used to qualify troops under current Army regulations for both tanks and Bradley fighting vehicles.

The two ranges covered in the instant contract are the Red Cloud Hotel (RC–H) range and Red Cloud Gulf (RC–G) range. The RC–H range is used for tank training and the RC–G range is used for the training of Bradley fighting vehicles. The need for upgrading these ranges derives from increas-

ing military requirements. Army standards now require that a tank hit two enemy targets within 24 seconds and that a Bradley fighting vehicle hit an enemy target three times within 16 seconds. The targets on the RC–H and RC–G ranges, *inter alia*, do not have variable speeds and do not allow for the registration of multiple hits.

The Army has recognized the need to modernize the RC–H and RC–G ranges since at least January 1995 and similar modernizations are scheduled for a variety of target ranges throughout the United States over the next few years. Initially, the upgrades to the RC–H and RC–G ranges were scheduled to be completed at a date later than that specified in the contract. By February 1997, the two upgrades had been rescheduled to their present dates.

To date, the need to upgrade the RC–H and RC–G ranges has not resulted in any troops failing to meet Army requirements. The Army evaluators have developed subjective methods of evaluating performance on these ranges and the troops eventually qualify on the MPRC range. In the past, ranges have occasionally been closed and troops that would have trained on those ranges were sent to other ranges that are later in progression than the closed ranges. The MPRC range, which is fully modernized and available at Fort Stewart for qualifying troops, is later in progression than both the RC–H and RC–G ranges.

### D.

If the court were to grant an injunction, the injunction obviously would not prevent the Army from upgrading the RC–H and RC–G ranges. The Army is concerned, however, that an injunction could delay the ability of the troops to train on more efficient upgraded ranges, and also could impair existing training schedules and thereby result in troops not being qualified under existing regulations. Indeed, defendant demonstrated at trial that the scheduling of training requires significant coordination. The Fort Stewart ranges are actively used by many different units from both the Army and the National Guard. The Army makes tentative training schedules for the upcoming fiscal year as

much as six months prior to the start of the fiscal year. Thereafter, modifications to the schedules occur weekly.

Based on allegations concerning the potential harm to troop training contained in affidavits presented by defendant, this court did not grant plaintiff's request for a temporary restraining order, notwithstanding the court's conclusion that plaintiff had established a substantial likelihood that plaintiff would prevail on the merits of its claim attacking the Army's purchase order contract with Caswell. At trial, with the benefit of time to reflect, the Army presented a more modest and considerably more detailed analysis of the possible effect of an injunction on troop training.

Defendant presented the testimony of Major Robert G. Zebrowski who serves as the training resource management officer for the Third Infantry Division at Fort Stewart. Major Zebrowski's responsibilities include range scheduling and the management of training ammunition and other training resources such as training areas. Major Zebrowski presented three different scenarios in an effort to illustrate the effect that a permanent injunction and the resulting reprocurement would have on the current Army training schedule. One of Major Zebrowski's scenarios, Option 1(a), assumed a procurement period lasting two weeks from the date of this opinion, June 27, 1997, and a completion date of October 9, or 104 days from this date. (The starting period for the two-week procurement period is apparently the result of the court having represented to the parties that it would make every effort to draft and issue this opinion by June 27, 1997, within three days of trial.) The other two options assumed a 30–day procurement process and a 120–day period for the completion of both upgrades, or 150 days from this date.

Under Option 1(a), completion of the RC–G range upgrade would occur earlier than the current plan with Caswell. The RC–G range is now closed for earth moving and construction work being performed by the Army. Caswell plans to begin installation on the RC–G range on September 1, 1997, and to complete installation by September 15. Under Option 1(a), installation on the RC–G range would begin on August 11, 1997, and would be completed by September 9, or 74 days from the date of this opinion and 60 days after the contract would have been issued. With respect to the RC–H range, Option 1(a) does not affect the Army's earth moving and construction schedule, but completion of the installation by the contractor would be delayed two months compared to Caswell's schedule, from August 12 to October 9. However, under Option 1(a), the RC–H range would be closed for a longer period than under the current schedule.[12]

When asked to categorize the harm to the Army that would result if Option 1(a) were accomplished, Major Zebrowski testified that the harm would be "of very little significance." Nevertheless, Major Zebrowski classified this option as "high risk." He did so because of the difficulty he perceived in the Army completing the earth moving and construction work on the RC–G range in time for the contractor to begin installation by August 11. Major Zebrowski did not consider the accelerated schedule to involve "high risk" because of any physical limitation, but rather because he believed that it would be difficult for Fort Stewart to get the Army to authorize any additional funds for the accelerated work in a timely manner. (Major Zebrowski did not quantify the amount of funding that would be needed.) This risk, however, was addressed in the testimony of another witness, Kendell N. Martin, who was in a better position than Major Zebrowski to know about the availability of funding.

Martin is the Team Chief for the Targetry Team, Combat Training Support Directorate,

---

12. With respect to this increased closure of the RC–H range, it is not evident why Major Zebrowski chose to allot 30 days for the installation of the targetry on each range under Option 1(a) when Caswell appears to have been allotted only two weeks for each installation and apparently even less time for the RC–H range. Hence, it appears that this 30–day period for installation is in fact overly generous. If in fact a contractor was allotted only two weeks to perform each installation, the Army engineers would have additional time for construction and earth moving, and the potential contractor would have more time available to arrange for the delivery and installation of the equipment.

which is part of the Army Training Support Center. Martin is directly involved in all targetry upgrades funded from centralized Army funds, including the upgrade at Fort Stewart, and the determination of whether a particular target upgrade project has a sufficiently high priority to be funded. Martin testified that as a result of this pending litigation and the possibility that this court would issue an injunction, the Army had made contingency plans in an effort to ensure that the upgrades would be completed by September 27, 1997. Martin explained that the Army has committed the additional funds necessary to meet this goal.[13]

While Major Zebrowski testified, in effect, that if the timing in Option 1(a) were achieved there would be no significant harm to troop training and combat readiness, he was not experienced in contracting and did not offer testimony as to the likelihood that the timing of this option could be achieved. Defendant offered the contracting officer's testimony on this issue and the contracting officer proposed a time schedule that would render Option 1(a) not a viable option. For example, the contracting officer concluded in effect that it would take 42 days just to enter a new contract. The contracting officer's time schedule recognized that a new procurement could be completed in less time than the contracting officer had suggested in the second justification (90 days) issued just days before. But the time schedule proposed by the contracting officer at trial still seems far too pessimistic because it assumes a sense of leisure about the procurement that is inconsistent with the alleged urgency involved. The contracting officer has already completed a detailed statement of work and performed the related analysis for the original contract work with Caswell. In a matter of days, the contracting officer should be able to modify Caswell's statement of work and eliminate from that statement any work that Caswell has already performed.

Plaintiff's president, Leon B. Bieri, testified in effect that he could satisfy the time requirements set forth in Option 1(a) with significant time to spare. He testified that he could respond to a solicitation within three to five days, and complete the contract work within 60 days. Hence, assuming the contract was awarded within two weeks, ATA could complete all of the contract work 30 days before the anticipated completion date in Option 1(a). Plaintiff's president certainly has a financial incentive to testify with optimism about his firm's abilities, but the factual testimony he offered concerning prior emergency procurements for Army target areas tends to support his position. As Martin confirmed, in 1994, the Army had an urgent requirement for installation of a target area in Haiti. A statement of work was written within about six to eight hours and using the FAR 6.302–2 urgency exception, the Army conducted expedited negotiations with a small number of competitors. The contract was awarded to ATA within two weeks and the work was completed within 45 days.

Martin testified that anticipating that ATA would complete the target upgrade work at Fort Stewart within 90 days would be a "best case" scenario and that 120 days is "reasonable." Martin believed that ATA had the capacity to deliver within 60 days but viewed 60 days as high risk because of ATA's dependency on suppliers to produce and deliver products to ATA. Bieri responded that suppliers would not pose a problem because ATA had existing open purchase orders with suppliers and a steady stream of parts was available. Bieri also referred to a contract for target products in Kuwait, which Martin testified involved a more difficult production schedule than that involved here, in which ATA completed the work in less than 60 days.

Option 1(a) is relatively close to Martin's 90–day, "best case" schedule. Assuming a contract is awarded two weeks from the date

---

**13.** The following is an exchange during trial between plaintiff's counsel and Martin regarding the availability of funds for the Fort Stewart upgrade:

Q: So if there were a requirement to finish the project by September 27, and additional money were needed, the Department of the Army would provide that money, would it not?
A: I think that's a very fair assessment. I think the money has already been committed to it.

of this opinion under Option 1(a), a contractor would have to complete installation on both ranges approximately 90 days after contract award. Can plaintiff or any other contractor actually perform the work in the time frame set forth in Option 1(a) or any somewhat longer time frame that would not result in any significant harm to troop training and combat readiness? Based on the limited evidence submitted at trial, the answer is very possibly yes, but the court cannot answer that question with certainty and apparently neither can the Army based on the information it has at this time. But present certainty with respect to ATA's capacity to perform the contract work is not a prerequisite for the court to grant an injunction.

The crucial point is that the federal procurement statutes and related regulations permit defendant sufficient options with respect to any reprocurement so that defendant can avoid any significant harm to troop training and combat readiness. As described above, the Army can solicit competitive bids and offers on an expedited basis. Under this option, if best suited in the circumstances, the Army can choose to purchase from Caswell those products listed on Caswell's FSS contract and either purchase or use in-house resources to secure the remaining products and services required under the contract. Alternatively, if upon review the Army concludes that there exists an "unusual and compelling urgency," the Army can proceed under FAR 6.302–2 and not procure the products and services using full and open competition. If the Army reasonably chooses this option, FAR 6.302–2 grants the Army broad flexibility to take the actions it deems reasonably necessary to address the urgency with which it is faced. The sole pertinent limitation is that to the extent the Army does not utilize competitive procedures, the Army must request offers from as many potential sources as is practicable under the circumstances. 10 U.S.C. § 2304(e); FAR 6.301(d) and FAR 6.302–2(c)(2).

It is within the discretion of the Army, when faced with an urgent and compelling situation, to determine what is practicable under the circumstances. Under the standard articulated in 5 U.S.C. § 706, courts will not interfere with such a determination unless it is arbitrary or capricious. Hence, herein, the Army should perform a reasoned, albeit expedited, assessment of the extent to which the instant situation involves urgent and compelling circumstances and the level of competition that is practicable. If upon review the Army reasonably concludes that ATA or any other competitors cannot make an offer or submit a bid within the time frame required to address the compelling circumstances or that there would be an unacceptable risk that ATA or other possible alternatives would not be able to fulfill the contract work in a timely manner, the Army can enter a new contract with Caswell. On the other hand, the Army's efforts may well lead to the conclusion that a viable competitive option exists and the result could be a better and less costly alternative. In this regard, ATA has prevailed over Caswell recently in target range procurement open to competitive bids. This possibility of competition bringing lower prices is precisely what the CICA is directed at preserving.

It is important to stress that this court is not requiring defendant to conduct the new procurement in any particular way. The court is merely enjoining continued performance of a legally defective procurement. ATA was a prospective bidder for the contract work and has the right to protest the issuance of a contract in violation of controlling law. ATA has prevailed and the Army must proceed with a new procurement. It is possible that ATA or some other competitor potentially may be awarded all or part of a contract issued consistent with statutory and regulatory mandates. Because the Army has the tools at hand to ensure that any reprocurement does not result in any significant harm to the Army or the public, the court will grant an injunction to preserve this potential for ATA and other competitors.[14]

14. As explained above, in determining whether to grant an injunction, the public interest and any resulting harm to third parties must be considered. Analysis of public interest in effect is subsumed within the discussion above. The public has an interest in both efficient procurement, consistent with applicable rules and regulations, and the efficient training of United States troops.

## 510

### IX.

Defendant orally requested that the court suspend any injunction pending appeal. *See* RCFC 62(a) and (c). In this case, a suspension of the injunction could be highly prejudicial to plaintiff and could preclude plaintiff from securing adequate relief. As explained above, time appears to be of the essence with respect to any reprocurement. The longer the effective date of an injunction is delayed, the greater the potential interference with defendant's training schedule and the greater the potential harm to troop readiness. Therefore, defendant's motion to suspend the effective date of the injunction is denied.

### Conclusion

For the reasons set forth above, plaintiff's motion for a permanent injunction is granted. Defendant shall suspend performance under and take the necessary steps to terminate Purchase Order DAAE20–97–F–0048. No costs.

IT IS SO ORDERED.

---

As explained above, an injunction will further the public interest in efficient procurement and should not impair troop training or combat readiness. With respect to third parties, Caswell will not be harmed by the injunction because it will receive appropriate compensation for the termination of its contract and will be in a position to bid on any reprocurement.