**PETCHEM, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. Civ.A. 99–3135 (EGS).**

United States District Court, District of Columbia.

May 15, 2000.

David T. Smorodin, Assistant United States Attorney, Washington, DC, for U.S.

Denis Lawler, Craig L. Hymowitz, Blank, Rome, Comisky & McCauley, LLP, Philadelphia, PA, for Plaintiff.

### MEMORANDUM OPINION

SULLIVAN, District Judge.

## I. INTRODUCTION

This case involves the Navy's procurement policies for certain tug boat services at Port Canaveral, Florida. Plaintiff, Petchem, Inc., ("Petchem" or "plaintiff") is a small business that had been providing these tug services at Port Canaveral since 1984. With Petchem's most recent contract due to expire in fall 1999, the Navy, in the summer of 1999, solicited bids for a new contract for the tug services. Petchem was one of seven small businesses to bid on the work. However, on November 23, 1999, the Navy announced that it was canceling its solicitation for a new contract on the tug work because all of the bids were deemed too high in comparison to market rates at Port Canaveral. The next day, plaintiff filed this lawsuit alleging a violation of the Competition in Contracting

Act (CICA), 10 U.S.C. § 2304.a.1 and 41 U.S.C. § 253.a.1.

Plaintiff initially sought a temporary restraining order that would have extended Petchem's most recent contract at Port Canaveral. This Court held a hearing on that motion on December 10, 1999 and found that plaintiff had not met its burden for a temporary restraining order under *Washington Metropolitan Area Transit Commission v. Holiday Tours,* 559 F.2d 841, 843 (D.C.Cir.1977). Pursuant to Fed. R.Civ.P. 65(a)(2), the Court consolidated the request for injunctive relief with the merits determination. Now, this matter is before the Court on the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56(c). Upon consideration of the pleadings and the arguments of counsel, and for the following reasons, the defendant's motion for summary judgment is GRANTED and the plaintiff's motion for summary judgment is DENIED.

## II. PROCEDURAL HISTORY

Plaintiff Petchem had provided tugboat services for the Military Sealift Command (MSC) and Naval Ordnance Testing Unit (NOTU) at Port Canaveral, Florida since January 1984 under a series of contracts. The contracts involved towing nuclear submarines and surface vessels, as well as transferring military personnel to and from these vessels. The most recent contract was to have expired on November 30, 1999, but was extended through December 14, 1999. That contract provided Petchem a fixed monthly payment in exchange for the exclusive use of Petchem's two tugboats and one personnel transfer vessel on a 24–hour, 365–day per year basis.

Early in 1999, naval procurement officials began preparing a new solicitation for the tug and personnel transfer services at Port Canaveral. Concluding that the demand for these services would be substantially reduced in the future, the Navy decided to abandon the fixed-price contract it had been using with Petchem in favor of a so-called Indefinite Delivery/Indefinite

Quantity (IDIQ) contract under which the government would pay for only the amount of services it actually used above a stated minimum. (Def.'s Mot. to Dismiss at 4.) The solicitation was issued on July 9, 1999 as a small-business set-aside. However, large firms were also allowed to submit bids in the event that there were not at least two offers from qualified small business providers. The Navy reserved the right to award different portions of the work to different bidders unless the bidder specified that it would not accept a partial award.

MSC received seven bids from qualified small business concerns and, as a result, did not open the single bid submitted by a large business. Petchem was among the seven small business bidders. Petchem submitted an initial bid in early August, revised the bid to reflect MSC's concerns regarding pricing and technical issues, and submitted a final bid on September 29, 1999.

On or about November 12, 1999, the Navy informed Petchem it would be allowed to compete for any contracts for tug boat work over $2,500. On November 19, 1999, the government notified Petchem it would end the then-current contract entirely on November 30, 1999 [1] and not use its option to extend the contract up to four months.

On November 23, 1999, MSC officially canceled the solicitation for tug services.[2] The bids from the seven small business providers were all deemed too high in comparison to posted rates from the port's commercial operator, Port Canaveral Towing (PCT).

On November 24, 1999, Petchem filed this lawsuit against the government, alleging violations of the Competition in Contracting Act (CICA), 10 U.S.C. § 2304.a.1 and 41 U.S.C. § 253.a.1, the Small Business Act, 15 U.S.C. § 631, and the Federal Acquisition Regulations (FAR), 15.306(d)(3) and 19.506. The lawsuit was initially filed in the United States Court of Federal Claims, but was removed to this Court because of the possibility of maritime issues. *See* Order of November 24, 1999, U.S. Court of Federal Claims, No. 99–953C.

Since Petchem's contract expired in mid-December, the MSC has been procuring tug services on a piecemeal basis—to date on a competitive, spot-bid basis from PCT, a large commercial operator in the area, or from Petchem. Petchem and PCT have both received some of the tug jobs bid in this fashion.

## III. CROSS–MOTIONS FOR SUMMARY JUDGMENT

Plaintiff's original complaint alleged five counts of improprieties regarding the Navy's handling of the now-canceled Port Canaveral solicitation. Over the course of the litigation, however, plaintiff has abandoned several of those allegations and now presses only its first count: that the government is violating the Competition in Contracting Act (CICA), 10 U.S.C. § 2304.a.1 and 41 U.S.C. § 253.a.1, by failing to award the tug work via "full and open" competition.

CICA requires agencies, including the military, to promote competition for federal contracts. The law generally requires that procurement be conducted via "full and open" competition designed to ensure maximum participation.[3] However, there are various exceptions to this requirement

---

**1.** The contract was subsequently extended until December 14, 1999.

**2.** MSC did not cancel the portion of the solicitation for personnel transfer services and that contract was subsequently awarded to CRC Marine, the low bidder for this work, on December 21, 1999. Petchem was not eligible

for that contract because it had indicated it would not accept a partial award for the solicitation—only the entire contract for personnel transfer and tug work.

**3.** *See* 48 C.F.R. § 6.102 (detailing the procedures that meet the requirement for "full and open" competition).

including a partial exception for smaller contracts. Specifically, procurement under the "Simplified Acquisition Threshold" (SAT) of $100,000 is subject to lesser requirements. So-called micro-purchases of up to $2,500 are even less restricted.

Plaintiff contends that although the small business bids were deemed unacceptably high, the Navy was not relieved of its statutory obligation to secure the tug services through "full and open" competition. Specifically, plaintiff argues that defendant was required to re-solicit the tug services work on a "full and open" basis. Had it done so, plaintiff contends, Petchem and other bidders would have known they were competing against the commercial rates and might have lowered their bids accordingly.

■ Petchem claims that the tug work does not qualify for any of the regular statutory exceptions to CICA, 10 U.S.C. § 2304(a)(3)(c)1–7. Moreover, Petchem maintains that the government does not qualify for the looser requirements for purchases below the SAT of $100,000, or below the "micro-purchase threshold" of $2,500. It is a violation of CICA, 10 U.S.C. § 2304(g)(2),[4] and FAR 13.003 [5] to fragment a procurement order that would fall above the SAT simply to take advantage of the simplified procedures. Plaintiff maintains that defendant is engaging in precisely this type of prohibited fragmenting, since the government's own estimates for the original solicitation were much higher than $100,000.[6]

Alternately, plaintiff argues that defendant is violating the general requirement that procurements over $2,500 but under $100,000 be reserved for small business providers. See FAR 13.003 and FAR 19.502–2. Since seven small businesses bid for original solicitation, plaintiff contends that it was reasonable for the contracting officer to expect at least two to bid on the tug work and, therefore, that these contracts should be a small-business set-aside.

Plaintiff is seeking summary judgment and an injunction that would order MSC to re-solicit the tugboat contract and would block MSC from awarding the tugboat work to any contractor other than Petchem during the re-solicitation.

Defendant has countered with a motion to dismiss or, in the alternative, for summary judgment under Fed.R.Civ.P. 56(c).[7] Defendant argues that procurement officers enjoy considerable discretion in regard to contracting and that, here, plaintiff has failed to show an abuse of that discretion. Procurement officers began with an effort to secure the tug work through a competitive solicitation and abandoned that effort only when all the bids came in well above market rates. Hence, defendant maintains, there was no attempt to evade CICA thresholds or requirements, and procurement officers acted in good faith and within legal discretion in choosing this route to obtain tug boat services. Part of this argument is the government's contention that each tug is a distinct requirement that need not be aggregated for purposes of the CICA thresholds; although the government attempted to com-

---

4. 10 U.S.C. § 2304(g)(2) states: "A proposed purchase or contract for an amount above the simplified acquisition threshold may not be divided into several purchases or contracts for lesser amounts in order to use the simplified procedures required by paragraph (1)."

5. FAR 13.003(c) states in relevant part: "Do not break down requirements aggregating more than the simplified acquisition threshold ... or the micro-purchase threshold into several purchases that are less than the applicable threshold merely to—

(1) Permit use of simplified acquisition procedures, or

(2) Avoid any requirement that applies to purchases exceeding the micro-purchase threshold.

6. Plaintiff additionally alleges that MSC is fragmenting even further, to fall below $2,500 "micro-purchase" boundary, in violation of FAR 13.003(c)(2).

7. In response, plaintiff filed an opposition and cross-motion for summary judgment.

**54**

bine these requirements via an IDIQ contract, it was never required to do so and is not now.

## IV. DISCUSSION

### A. Standard of Review

Summary judgment should be granted pursuant to Federal Rule of Civil Procedure 56 only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bayer v. United States Dep't of Treasury,* 956 F.2d 330, 333 (D.C.Cir.1992). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran,* 517 F.2d 66, 67 (2nd Cir.1975). The cross-motions for summary judgment pending before the Court present no genuinely disputed material facts that would preclude summary judgment.

■ A contract award is considered an informal agency action for purposes of review under the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706. *See GE Government Services, Inc. v. United States,* 788 F.Supp. 581, 590 (D.D.C.1992) (citing *Doe v. Devine,* 703 F.2d 1319 (D.C.Cir.1983)). To prevail, the plaintiff must show the contracting officer was arbitrary and capricious, abused her discretion, or violated applicable rules and statutes. 5 U.S.C. § 706(2)(A). The D.C. Circuit has further refined this standard to suggest that the disappointed bidder must show the procurement official's decisions had no rational basis, or that the procedure involved a clear and prejudicial violation of applicable statutes and regulations. *See Kentron Hawaii Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973). Courts typically accord procurement officials, in particular, a significant amount of deference. (Mot. To Dismiss at 13, 14, citing *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289 (D.C.Cir.1971).)

### B. Fragmentation

Turning to the particulars of this case, the primary issue is whether the procurement officer improperly fragmented the procurement to evade requirements under CICA and FAR.

#### 1. Plaintiff's Argument

Plaintiff argues that this is a clear case of improper fragmentation given the Navy's initial estimates of its needs when it solicited the indefinite quantity or IDIQ contract in July. The regulation governing IDIQ contracts specifies that the government must use a realistic amount for the guaranteed minimum quantity specified in the solicitation.[8] Here, that minimum would still come in well above SAT threshold; the original solicitation guaranteed a minimum of 180 moves per tug, for a total of $340,320 per year without overtime and $459,432 with overtime, based on even the government's own estimates using commercial rates as a guide. (AR 316, AR 1514, and Plaintiff's Mem. in Supp. of Cross Mot. for Summ.Judg. at 4.) Plaintiff also notes that the solicitation was ostensibly canceled because prices were too high, not because the Navy downgraded its estimates of need. Petchem alleges that MSC is trying to get around this requirement by breaking up tug services into small increments that fall below the $100,000 cutoff triggering full CICA procedures. Therefore, according to Petchem, MSC should

8. FAR 16.504(a)(2) states that "... the minimum quantity must be more than a nominal quantity, but it should not exceed the amount that the Government is fairly certain to order."

re-solicit the tug work under a fully competitive procurement.

Plaintiff cites *L.A. Systems v. Department of the Army,* 1996 GSBCA LEXIS 54, a 1996 case from the General Services Administration Board of Contract Appeals, to support its claim. In *L.A. Systems,* protestors challenged four separate procurements for computer upgrades made within a short time span, alleging improper fragmenting of what was really a unified requirement above the SAT threshold. In that case, the Board of Contract Appeals found that the agency had improperly fractured its requirements. Although the court found that the individual procurement officer did not know of the entire need when he or she processed the four procurements separately, the court further found that the director of the agency had determined—at the same time—that all four computer upgrades were needed and were thus part of one "requirement." The court found this to be a violation of FAR 13.003(c). *L.A. Systems* at *27 (citing *Digital Services Group,* GSBCA 87–35–P).

### 2. Defendant's Argument

The government offers several counter-arguments. First, it cites *Canon U.S.A., Inc.,* 1986 WL 63273 (Comp.Gen.) to establish that a plaintiff must show that there was a specific intent to fragment a known requirement in violation of CICA and FAR. In the *Canon* case, which dealt with a comparable anti-fracturing rule under a different regulation, a contracting officer was found not to have improperly fragmented by making an initial purchase of six microfilm readers out of a total demand for 75 such machines. The opinion stated that the officer must have "specific intent" to evade the thresholds to violate the regulation. *See Canon* at *1 (stating that the protestors "would have had to show that the acquisition of the six units was merely the first in a series of purchase orders to be placed with the specific intent to evade the maximum dollar limitation....").

Moreover, defendant argues that the "need" at Port Canaveral is more indefinite than that in the *L.A. Systems* case. The government argues that an IDIQ contract by its nature deals with a series of smaller, discrete requirements that would each likely fall under the SAT were it not for the potential to consolidate them in an IDIQ contract. Here, defendant argues that its attempt to solicit a new IDIQ was unsuccessful, therefore it was permissible to forgo full solicitation. The core of this argument is the contention that tug requirements are separate and distinct as the jobs arise, not a single requirement that is subject to aggregation thresholds. Defendant bolsters this theory by citing several cases underscoring an agency's discretion to choose the type of contract that meets its needs. *See James Foos & Assocs.,* 1993 WL 7007 (Comp.Gen., Jan.6, 1993); *Professional Services Unlimited,* 1991 WL 290496 (Comp.Gen., Dec.30, 1991).

### 3. Analysis

The Court is concerned by the implications of both lines of argument. Under the government's view, it is often permissible to calculate requirements in small, recurring increments and thus evade the strictures of full and open competition for contracts valued at more than $100,000. This practice could easily be exploited as a loophole to evade Congress' intent in passing CICA.

In particular, it is troubling that several administrative documents generated in October seemed to anticipate that, if the original, small business solicitation were to be canceled, the MSC would go to a new solicitation or "free and open" competition. (AR 1510, 1534, 1535) There is no clear explanation in the record as to why this idea was bypassed in favor of the current, piecemeal bidding approach.

Yet the plaintiff's theory likewise offers no clear stopping point. Many discrete procurements could, in theory, be aggregated into one, larger procurement. Given

enough time, the aggregate value of many types of recurring requirements could top $100,000. This would leave an infinite number of procurement strategies open to attack as potential violations of the anti-fragmenting language in CICA and FAR.

Plaintiff maintains that Congress did intend to impose sharp limits on agency discretion when it passed CICA, citing *ATA Defense Industries,* 38 Fed.Cl. 489, which discusses the legislative history of CICA and Congress' desire to limit agency discretion on procurement. Thus, *ATA* urges a relatively strict reading of CICA and states "federal agencies have only the discretion that Congress allows them." *ATA Defense Industries,* 38 Fed.Cl. at 504. Yet while *ATA* does stand for the proposition of holding agencies to the statutory thresholds, it does not answer the question of what should properly be classified as one "requirement" for purposes of triggering the $100,000 threshold.

Neither party can point to controlling authority on the interpretation and implementation of the anti-fragmentation provisions of CICA and the FAR. Those cases they do cite address procurement of goods rather than services, and therefore do not confront the complicated issue of how far into the future a procurement officer must look in assessing a "requirement."

█ Here, there are several factors that tip in favor of the defendant's contention that there is no violation of CICA.

First, the applicable caselaw suggests there must be a clear intent to evade CICA. Here, the Court draws not only on the *Canon* case cited by defendant, *supra,* but also upon two opinions issued by the Comptroller General, and not addressed by the parties, concerning the propriety of spot purchasing in light of the anti-fragmenting requirements of CICA.

In *Mas Hamilton Group, Inc.,* 72 Comp. Gen. 6 (October 20, 1992), the plaintiff challenged an agency decision to purchase security locks as a series of procurements—allegedly in an improper exercise of fragmenting. However, the court upheld the piecemeal procurements to satisfy an urgent need for the locks because of the agency's "persuasive" explanation of complications toward issuing a competitive procurement for the locks. *Mas Hamilton Group* at * *11. "Here, where the agency is using the small purchase procedures to make short-term, filler buys until a fully competitive award can be completed," the court found no violation of CICA or FAR. *Id.*

Five years later, the Comptroller General applied a similar rationale to find that the use of month-to-month contracts for security guard services did not constitute an improper attempt to fragment a requirement and evade CICA. *See Master Security, Inc.,* 1997 WL 11254 (Comp. Gen.) at *6 (stating that "[w]hen an agency is faced with a critical need while being simultaneously unable to proceed with a fully competitive award for that item, it may properly use the small purchase procedures as an interim means to procure its needs until a fully competitive award is possible.").

Implicit in both these opinions is the idea that good faith efforts to comply with CICA's mandate for competitive procurement will protect a procurement officer's decision-making from a potential legal challenge of fragmenting. Of course, to be clear, in those cases the defendants represented that the spot purchases were merely an interim measure pending a full solicitation, whereas the defendant in this case does not specify when, if ever, MSC might seek to conduct a new solicitation for tug services at Port Canaveral. Yet in this case, unlike the scenarios in *Mas Hamilton* and *Master Security, Inc.,* the defendant has *already* conducted a good faith competitive solicitation (albeit one potentially reserved for a small business provider), involving several rounds of negotiation. Only after bidders had been given a chance to revise their offers did the procurement officer determine the prices were too high and move to dissolve the

solicitation. Thus the current practice of spot bidding is not in the first instance an attempt to evade a competitive solicitation, but rather the response to a failed attempt to employ such competitive bid procedures.

Second, this case does not involve the fragmentation of requirements that were precisely known to defendant on a given day. Rather, the defendant does have knowledge of a recurrent need but not of the particular dates or specifications of the tug work required. Further, defendant argues that the overall decline in demand for MSC operations at Port Canaveral, and by extension for tug work, makes it difficult to predict future needs from past experience. The Court is persuaded that this uncertainty, coupled with the good faith effort of the initial competitive solicitation, distinguishes this case from a case such as *L.A. Systems*.

This Court does not, however, pass judgment on defendant's contention that the MSC is always free to bid each tug as an individual "requirement." As the MSC continues to evaluate the changing requirements at Port Canaveral it must reassess its obligations under CICA and FAR and ensure that its procurement strategy is in keeping with the letter and spirit of those laws. Rather, the Court merely endorses the MSC's current spot bidding practices at Port Canaveral as appropriate under CICA and FAR on the facts of this case as a current strategy without deciding whether this would be acceptable as a permanent procurement policy.

Finally, it is significant that the government is bidding this work competitively between the two providers currently available in the Port Canaveral area.[9] Nor is it axiomatic that bidding out work in small increments is anti-competitive; indeed, some lawsuits challenge the government for "packaging" more than one requirement into a larger solicitation, on the theory that this practice effectively excludes some smaller providers and thus hurts competition.[10]

Here, there is ample support in the record that the government reasonably wanted to abandon the previous style of contract that supplied 24–hour service at a premium price. Once the attempt to aggregate the tug jobs in an IDIQ contract yielded no viable bids, it was a reasonable option to simply bid on a piecemeal basis since those spot, commercial rates were the basis for finding the small business bids unreasonably high. While the government *might* have re-solicited the tug work under an IDIQ contract with or without the small business restriction, it was not *required* to do so. The regulatory language for using an IDIQ-style contract is permissive, not mandatory: "An indefinite-quantity contract *may* be used when the Government cannot predetermine, above a specified minimum, the precise quantities of supplies or services that will be required during the contract period." FAR 16.504(b) (emphasis added). The tug jobs are sufficiently dispersed over time to

9. Indeed, the record suggests that White describes this as competitive procurement and suggests MSC did so even though the individual job was expected to be less than $2,500 (and therefore, presumably not subject to competitive bid requirements at all so long as the price obtained was reasonable). This practice undermines plaintiff's allegation of fragmenting to fall below the micropurchase threshold because defendant is not taking advantage of the lower bid amounts to sole-source the work.

10. See, e.g., *S & K Electronics*, 1999 WL 427411, *3 (Comp.Gen.) (noting that "[s]ince bundled, consolidated or total-package procurements combine separate, multiple re-quirements into one contract, they have the potential for restricting competition by excluding firms that can furnish only a portion of the requirement.") Moreover, it seems unlikely that the government would re-solicit the contract as a small business set-aside given that the original bids were deemed so far out of the acceptable price range. More likely, the government would issue a solicitation open to all bidders, large and small. It would be ironic if plaintiff were able to force such a solicitation through this lawsuit, when Petchem earlier protested the agency's effort to include large businesses in the original solicitation for the tug work at Port Canaveral.

justify bidding separately and, at least on this record, there does not seem to be a willful fragmenting or evasion of CICA. Nor does plaintiff point to any language suggesting that requirements, and the $100,000 threshold for use of the simplified acquisition techniques, must be calculated in yearly increments.

Thus, on the facts of this case, this Court does not find a clear and prejudicial violation of CICA or the FAR on the issue of fragmentation.

## C. Small Business Set–Aside

Having found that the Navy's current procurement strategy for tug work at Port Canaveral does not constitute an evasion of CICA's provisions for requirements greater than $100,000, the Court turns to plaintiff's alternate theory that defendant is evading the small-business set-aside for procurements under the SAT of $100,000 and above the "micro-purchase" threshold of $2,500. The pertinent regulation, FAR 13.003(b)(1), states:

> Each acquisition of supplies or services that has an anticipated dollar value exceeding $2,500, but not over $100,000, is automatically reserved exclusively for small business concerns and shall be set aside unless the contracting officer determines that there is not a reasonable expectation of obtaining offers from two or more responsible small business concerns that are competitive in terms of quality, price and delivery.

This regulation works in tandem with FAR 19.502–2, which states: " . . . If the contracting officer receives only one acceptable offer from a responsible small business concern in response to a set-aside, the contracting officer shall make an award to that firm."

The decision whether or not to create a set-aside under this regulation is within the discretion of the agency and will not be second-guessed by the courts "unless an abuse of discretion is clearly shown." *Nordic Sensor Technologies, Inc.,* 1999 WL 533611 at *1 (Comp.Gen.) (citation omitted). Plaintiff contends that since seven small business companies submitted bids for the original solicitation, it was reasonable for the procurement officer to expect that at least two would bid for the tug work on a spot basis.

The government argues that Petchem is the only small business company operating in Port Canaveral (Declaration of Juanita White, a contracting officer at MSC, at ¶ 2, stating that Petchem and PCT are "the only two commercial tug operators at Port Canaveral.") and there is nothing in the record to contradict this. It appears reasonable for the procurement officer to conclude that small business providers who did not have ongoing operations in Port Canaveral would not be available to bid on or have the capability to provide spot tug work on short notice. Indeed, Petchem itself had earlier represented that it would be forced to abandon the area if its contract were not extended or a new one approved. However, Petchem later notified the MSC that it was available to perform ongoing work and, accordingly, has been offered an opportunity to compete with PCT, the only commercial operator at the port. It is telling that no other small business bidder provided the government with such notice, either after the original solicitation was cancelled or since MSC began bidding the work on a spot basis. Therefore, this Court finds no basis to conclude that the contracting officer abused his discretion in deciding not to set-aside the spot tug work pursuant to FAR 13.003(b)(1).

## V. CONCLUSION

Therefore, for the reasons stated, the Court finds that there has been no clear and prejudicial violation of CICA or FAR. Accordingly, Plaintiff's Motion for a Permanent Injunction and Cross Motion for Summary Judgment [19] is DENIED, Defendant's Motion for Summary Judgment [17] is GRANTED, and the above-captioned case is DISMISSED WITH PREJ-

UDICE. An appropriate order shall accompany this opinion.

### ORDER

Upon consideration of the parties' cross motions for summary judgment, the oppositions and replies thereto, the arguments in court and for the reasons detailed in the attached memorandum, it is hereby

ORDERED that Plaintiff's Motion for a Permanent Injunction and Cross Motion for Summary Judgment [19] is DENIED; and it is further

ORDERED that Defendant's Motion for Summary Judgment [17] is GRANTED; and it is further

ORDERED that this case is DISMISSED WITH PREJUDICE.